MSE:
AO 91 (Rev. 11/11) Criminal Complaint                                                                        2020R00251

# UNITED STATES DISTRICT COURT
for the
District of Minnesota

UNITED STATES OF AMERICA

        v.

    Case No.

(1) ███████████████████████

(2) BAILEY MARIE BALDUS

## CRIMINAL COMPLAINT

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief.  On or about May 28, 2020, in St. Paul, in the State and District of Minnesota, the defendants ████████████████ and BAILEY MARIE BALDUS conspired with Samuel Elliott Frey and Co-Conspirator CF to commit arson on property used in interstate commerce, in violation of Title 18, United States Code, 844(i), all in violation of Title 18, United States Code, Section 371.

I further state that I am an ATF Special Agent and that this complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒Yes  ☐ No

_____
*Complainant's signature*

SUBSCRIBED and SWORN before me
by reliable electronic means (FaceTime and email)
pursuant to Fed. R. Crim. P. 41(d)(3).

Laura Gulick, ATF Special Agent
_____
*Printed name and title*

Date:   June 8, 2020

City and State:   St. Paul, MN

_____
*Judge's Signature*

The Honorable Hildy Bowbeer
United States Magistrate Judge
_____
*Printed Name and Title*

2020R00251

UNITED STATES DISTRICT COURT

ss

COUNTY OF RAMSEY

## <u>AFFIDAVIT</u>

I, Laura Gulick, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am employed as a Special Agent with the Bureau of Alcohol Tobacco & Firearms (ATF), and have been so employed since September 2014. I am currently assigned to the St. Paul Division. The mission of the ATF is to protect communities from violent criminals, criminal organizations, the illegal use and trafficking of firearms, the illegal use and storage of explosives, acts of arson and bombings, and other crimes.  I have graduated from the 26-week combined Criminal Investigator Training Program at the Federal Law Enforcement Training Center, and the Special Agent Basic Training at the ATF National Academy. I have successfully completed courses in criminal investigations, tactical training in executing searches of persons and premises, courses in federal firearms violations, federal arson laws, federal explosives laws, and other general investigative matters.  In my capacity as an ATF agent, my responsibilities include, but are not limited to, investigating violation of federal laws related to weapons and violent crime under Titles 18 and 26 of the United States Code.

2.     Before joining the ATF, I was employed as an Intelligence Research Specialist for Homeland Security Investigations for 8 years.  As an Intelligence

2020R00251

Research Specialist, I assisted in hundreds of investigations regarding federal crimes, including firearms violations and narcotic violations. Prior to my employment with HSI, I was an active duty Military Intelligence Officer in the United States Army.

3.    This affidavit is submitted in support of the following:

(a)    a criminal complaint alleging that defendant ███████ ████ ████ ("defendant ████") and defendant BAILEY MARIE BALDUS ("defendant BALDUS"), together with Samuel Elliot Frey ("Frey"),[1] and Co-Conspirator CF (collectively, the "co-conspirators") have conspired with each other to commit arson on property used in interstate commerce, in violation of Title 18, United States Code, Section 844(i), all in violation of Title 18, United States Code, Section 371 (Count 1); (the **"Subject Offense"**).

4.    Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact in this investigation known to me and to others. This affidavit is based upon my personal knowledge, information provided to me by other law enforcement agents and investigators, my review of records, interviews of witnesses, and my training and experience, among other things. I have also included facts described in the Hennepin

---

[1] On June 8, 2020, Frey was charged by criminal complaint in Case No. 20-MJ-358-HB with conspiracy to commit arson on property used in interstate commerce in violation of 18 U.S.C. § 371 and 18 U.S.C. § 844(i) (Count 1), and arson of property used in or affecting interstate commerce in violation of 18 U.S.C. § 844(i) (Count 2). In addition, on June 8, 2020, in Case No. 20-mj-359-HB, Magistrate Judge Bowbeer issued a warrant authorizing the government to search and seize certain items from Frey's residence at the 6400 Block of Winnetka Avenue North in Brooklyn Park, Minnesota.

County Complaint charging Officer Derek Chauvin as described below, as well as reports by the media, including video footage, that have been publicly aired between Monday, May 25, 2020 and today, and updates that have been provided by local, state, and federal officials and agencies.

## FACTUAL BACKGROUND

5.   On Monday, May 25, 2020, in the early evening, someone called 911 and reported that a man had used a counterfeit $20 bill to purchase items from the Cup Foods convenience store at 3759 Chicago Avenue in Minneapolis.   At 8:08 p.m., Minneapolis Police Department (MPD) Officers Thomas Lane and J.A. Kueng arrived with their body worn cameras (BWCs) activated and running. The officers learned from store personnel that the man who passed the counterfeit $20 bill was parked in a car around the corner from the store on 38th street.

6.   BWC video obtained by the Minnesota Bureau of Criminal Apprehension shows that the officers approached the car, in which three individuals were sitting.  George Floyd was in the driver's seat, another man was sitting in the front passenger seat, and a woman was sitting in the back seat.  Officer Lane approached from the driver's side and interacted with Mr. Floyd.  Officer Kueng approached from the passenger side and interacted with the front seat passenger. At some point during these interactions, the officers ordered Mr. Floyd to exit the car and placed him in handcuffs.

7.   Over the next several minutes, officers moved Mr. Floyd from a seated position on the ground, to a standing position outside the squad car, and then to

2020R00251

sitting in the squad car. During this period, Mr. Floyd was telling officers that he was claustrophobic and could not breathe. Also during this time, MPD Officers Derek Chauvin and Tou Thao arrived in a separate squad car to assist.

8.    At approximately 8:19 p.m., Officer Chauvin pulled Mr. Floyd out of the passenger side of the squad car, Mr. Floyd went to the ground face down, still in handcuffs. Officer Kueng held Mr. Floyd's back and Officer Lane held his legs. Officer Chauvin placed his left knee in the area of Mr. Floyd's head and neck. During the next few minutes, Mr. Floyd repeatedly said "I can't breathe." The three officers who were holding him down, stayed in their positions. After approximately five minutes, Mr. Floyd stopped moving. The three officers remained in their positions for nearly three more minutes. Officer Chauvin removed his knee from Mr. Floyd's neck at approximately 8:27 p.m., after an ambulance and emergency medical personnel arrived. The officers placed Mr. Floyd, who appeared unresponsive, onto the gurney. Mr. Floyd was pronounced dead at the Hennepin County Medical Center.

9.    During this incident, multiple bystanders gathered around the scene. At least one bystander filmed the incident, and shortly after it occurred, posted a video on social media that soon went viral.

10.    By Tuesday morning, May 26, local and national news outlets had picked up the story about Mr. Floyd's death, and by Tuesday afternoon, thousands of people were gathered in the area of 38th and Chicago Avenue to protest the treatment of Mr. Floyd.

2020R00251

11.    Following the mostly peaceful protests that occurred on Tuesday night, the cities of Minneapolis and St. Paul, and some surrounding communities, endured three nights of violence and destruction. Between Wednesday afternoon and the early hours of Saturday morning, following several organized and peaceful protests, hundreds of individuals carrying on into the night vandalized and looted local businesses and destroyed buildings, vehicles, and other property through arson, smashing doors and windows, hurling objects and other measures. On Wednesday night, for example, individuals broke into the Target Store and Cub Foods near the East Lake Street/Hiawatha intersection in Minneapolis, near the site where the police encountered Mr. Floyd on Monday, vandalized and looted the businesses, and then set fires inside.  Numerous other businesses in the neighborhood, and in the City of St. Paul, were looted or partially destroyed by vandalism and/or fires.  On Thursday night, the Minneapolis Third Precinct police building was heavily damaged by fire.

12.    As of Saturday morning, May 30, the Minneapolis Star Tribune reported that approximately 246 businesses across the Twin Cities area had been vandalized, looted, partially or completely destroyed by fire, or otherwise severely damaged.

## PROBABLE CAUSE

### Fire Scene Investigation at 1360 University Avenue West, Unit 105, Saint Paul, Minnesota

13.    On Thursday, May 28, 2020, one of the buildings damaged by fire in the Twin Cities area was a commercial building located at 1360 University Avenue West,

2020R00251

Saint Paul, Minnesota.  That commercial premises is a strip mall structure that contains within it a small business called Great Health and Nutrition.

14.     Per its website's mission statement, Great Health and Nutrition is an independent supplement retailer, specializing in holistic health, sports nutrition, and natural detox products.  On June 3, 2020, an ATF Special Agent contacted JR, the owner of Great Health and Nutrition. JR told ATF personnel that he primarily purchases his product inventory from NOW Foods.  According to information from NOW Foods—including from its website (*see* https://www.nowfoods.com/now/about-now/facilities)—NOW Foods is "one of the natural products industry's premier manufacturers" with "several manufacturing and distribution facilities in the United States and Canada."   More specifically, NOW Foods is "headquartered in Bloomingdale, Illinois, where [its] corporate offices and primary manufacturing facility are located. NOW also operates a ... distribution facility in the neighboring town of Roselle [Illinois]" as well as "a manufacturing and distribution facility in Sparks, Nevada."  Great Health and Nutrition also receives products from "Nature's Plus," which I know from publicly available information is a brand that is part of "Natural Organics Inc." located in Melville, New York.   Great Health and Nutrition additionally receives products from "Super Natural Distributors," which I know from publicly available information is located in Waukesha, Wisconsin.  Accordingly, I know from information provided by Great Health and Nutrition and its owner, JR, as well as from publicly available information about Great Health and Nutrition's various inventory suppliers, that Great Health and Nutrition is a business that has

2020R00251

routinely received products that travel in interstate commerce into the State of Minnesota from elsewhere.

15.    On June 3, 2020, an ATF Special Agent and Certified Fire Investigator, along with several other members of the investigation team, examined the Great Health and Nutrition store. The ATF's initial examination revealed the business had been secured with plywood. ATF investigators observed that the glass entry door and one window on the front of the business had been broken, along with damage to the entry door itself.   ATF investigators also observed that laminate particleboard shelving units lined the interior walls of the business.  Along the east interior wall ATF investigators observed one of the shelving units sustained fire damage in the form of charring, discoloration, and soot and smoke deposits to the upper two shelves, as well as charred paper on these shelves.  ATF investigators observed that the wall behind the shelving unit also sustained fire damage in the form of charring, discoloration, and soot and smoke deposits.  Based upon their observations on the scene together with their training and experience, ATF investigators eliminated any natural or accidental causes of fire in the area of the shelving unit.  ATF investigators also observed light smoke deposits on the HVAC air intakes and discharge vents located in the drop ceiling.  Based on the scene examination, as well as a subsequent review of the video surveillance (as discussed below), the ATF Special Agent and Certified Fire Investigator on the scene determined the fire cause to be the application of an open flame to available combustibles.  The other fire investigators present during the scene inspection on June 3, 2020, concurred with the

2020R00251

determination of the ATF Special Agent and Certified Fire Investigator that the cause of the fire at the Great Health and Nutrition store was incendiary.

### *Surveillance Video*

16.     Beginning June 2, 2020, and at various points thereafter, I have communicated with JR, the owner of Great Health and Nutrition. Among other things, JR said that he was alerted to people inside his business on the evening of May 28, 2020, when he received a call at approximately 7:00 p.m. from RW, the owner of a UPS store that is next door to JR's business in the strip mall. At that time, JR's store was closed and JR was not at his business. (JR received a previous call from the UPS owner at approximately 3:49 p.m., but JR believes he was still present in his store at that time when RW called.)

17.     JR said that he has a remote wifi based surveillance system, "iSmart View Pro," through which he can monitor audio and video of inside the Great Health and Nutrition premises. According to JR, this recording system does not store historical footage, but rather, an active user can record the current view depicted from the camera. JR said that, after he was notified of intruders in his store (which he believes was at approximately 7:00 p.m. on May 28, 2020), JR began recording footage using his iSmart View Pro. JR observed individuals in his store that he could see, among other things, taking inventory, damaging property, and setting a fire. JR provided ATF with a copy of the May 28, 2020 video surveillance footage, which includes two separate video files: (1) a video with a filed named in part "20200528_195153" that is approximately 2 minutes 35 seconds in duration ("Video

1"), which is chronologically followed by (2) a video with a file named in part "20200528_195527" that is approximately 3 minutes 48 seconds in duration ("Video 2").

18.    ATF investigators have reviewed the video surveillance footage concerning Video 1. ATF investigators observed the following individuals, as non-exhaustively summarized below:

(a)    A white male wearing a green and black hoodie, dark colored pants and black tennis shoes who, as discussed below, has subsequently been identified as Frey.  He has dark brown hair, the top of which is pulled into a band.  FREY is carrying a black backpack with a yellow design on the front.

(b)    A white female wearing a black tank top, black pants and light colored Converse-style tennis shoes who, as discussed below, has subsequently been identified as defendant ███████. Defendant ███████ has light brown shoulder length hair and was carrying a two toned gray backpack.  Defendant ███████ has on her wrist a large watch with an oversized circular face with a light colored band.

(c)    Co-Conspirator CF is a white female with brown hair wearing a black T-shirt, black pants and black tennis shoes.

(d)    A white female with hair pulled back into a pony tail, wearing a gray crop top, black leggings, and black tennis shoes who, as discussed below, has subsequently been identified as defendant BALDUS.  Defendant BALDUS has multiple tattoos on her arms, and appears to be wearing around her neck

9

2020R00251

a dark colored "choker."   Defendant BALDUS's hair appears to be predominately blond on the ends, but dark colored at the base of her scalp.

19.    Based upon ATF agents' review of Video 1, Frey, defendant ▮▮▮, defendant BALDUS, and Co-Conspirator CF, are together inside the Great Health and Nutrition store when Video 1 begins, and thereafter the following things occur, as non-exhaustively summarized below:[2]

- At the approximately 0:01 time mark, Frey and defendant ▮▮▮ appear to turn their heads and gaze towards the store entryway, apparently concerned with onlookers who may see their activity inside the store.

- At the approximately 0:18 time mark, Co-Conspirator CF throws defendant ▮▮▮ multiple beverages from a refrigerator while defendant ▮▮▮ laughs.

- At the approximately 1:11 time mark, Co-Conspirator CF asks defendant ▮▮▮, "do I still have milk in my eye?" Defendant ▮▮▮ then approaches Co-Conspirator CF, gets close, and looks at her face from approximately one foot away.

- At approximately the 1:36 time mark, a female co-conspirator tells an unknown individual off camera that "there's nothing in here," and Frey asks that unknown individual if there are any stores with anything left.  When told there is nothing left, Frey turns and breaks a glass display case which causes the co-conspirators to cheer.  One of the co-conspirators then yells, "Do another one!" Frey walks to the front and breaks another display case.

- At approximately the 1:55 time mark, Frey breaks the front display case with a stick. Defendant BALDUS says "bro," smiles at Frey, and then throws an unknown item at Frey.

- At approximately the 2:11 time mark, one of the co-conspirators exclaims, "Do ya'll need some masks" as unknown individuals enter the

---

[2] This affidavit contains summaries of some of the words that can be heard in Video 1 and Video 2.  These are not intended to be verbatim transcripts.

2020R00251

store. Frey then grabs blue medical face masks sitting in the front display case. Defendant  states to FREY, "hand me, hand me." One of the co-conspirators asks "do you need a mask?" Defendant ▮▮▮ apparently states to FREY "hand them to me" and then apparently states words to the effect of "so that I can hand them out." Frey hands defendant ▮▮▮ the face masks, and defendant ▮▮▮ places them in her backpack.

- At approximately the 2:26 time mark, Co-Conspirator CF can be heard asking (while holding a can that bears the resemblance of a Red Bull can), "isn't Red Bull flammable?"

- At various points in Video 1, two other unknown individuals can be seen entering the store for a short duration and then departing with minimal (if any) interaction with defendant ▮▮▮, defendant BALDUS, Frey, and Co-Conspirator CF.

20.     During the course of the activity depicted in Video 1, defendant ▮▮▮, defendant BALDUS, Frey, and Co-Conspirator CF described above are joined by Individual A. Individual A is a white male with dark brown hair wearing a blue baseball hat (with sunglasses affixed to it), a Hawaiian style button down shirt, dark colored shorts, gray shoes, carrying a dark colored back pack.

21.     ATF investigators also observed Video 2, which, according to store owner JR, is video footage that picks up chronologically almost immediately after the footage that JR recorded in Video 1. A digital still frame image from Video 2 is shown below that includes the co-conspirators together with Individual A:

2020R00251



22.   ATF's further review of the May 28, 2020 video surveillance footage revealed the following about the five individuals' conduct within Great Health and Nutrition, as non-exhaustively summarized below:

- At approximately the 0:25 time mark, the co-conspirators and Individual A discuss having "Fifty bowls," apparently because they had "raided the fucking tobacco shop" in reference to the St. Paul Midway location by the Target and Cub (Note: On June 3, 2020, I spoke with K.A., the owner of Midway Tobacco Outlet Plus, who confirmed his store had been looted during the riots).

- At approximately the 1:00 time mark, Frey hands defendant ██████ a pipe that he had just been smoking.

- At approximately the 1:01 time mark, one of the female co-conspirators says, "who's got a lighter?"

- At approximately the 1:11 time mark, at least two of the co-conspirators state in apparent unison something about "lighting this bitch up."

- Seconds later, at approximately the 1:14 time mark, Frey has what appears to be hand sanitizer in his left hand, takes the cap/plunger off

12

and pours it onto the shelf on the ground. One of Frey's co-conspirators states, "We're lighting this bitch up, bro." One of Frey's co-conspirators then talks about hand sanitizer.

- At approximately the 1:17 time mark, some of the co-conspirators are visible knocking over shelving units onto the floor as one of Frey's co-conspirators states, "We don't got to worry, it'll all be burned." Also, at this point, a female co-conspirator's voice and a male voice can be heard inquiring, "Do you have any lighters?"

- At approximately the 1:31 time mark, Co-Conspirator CF knocks over a shelving unit.

- At approximately the 1:34 time mark, Frey can be seen using a lighter to light paper on fire, places it on the area where he previously spread the contents from a clear bottle and then takes bottles he finds on the counter and spreads the contents on the same area. A female co-conspirator can then be heard telling the others nearby, "He's, uhhh, lighting... dropping fire..." While Frey is lighting paper on fire, defendant ███ is sitting on the ground within arms-reach.

- At approximately the 1:58 time mark, Co-Conspirator CF pours out onto the ground a liquid from a can consistent in appearance with a Red Bull energy drink, apparently attempting to widely disperse the contents on the floor. (Note: In Video 1, Co-Conspirator CF had previously inquired "isn't Red Bull flammable?").

- At approximately the 2:08 time mark, Frey is seen using a lighter to light an apparent magazine on fire. A co-conspirator says, "...don't light this bitch up yet."

- At approximately the 2:14 mark, after apparently lighting the magazine on fire, Frey immediately turns towards the shelving unit that ultimately sustained fire damage. Frey is seen standing and moving in front of the bookshelf, but the activity of his hands are obscured from the approximate 2:14 time mark to the approximate 2:28 time mark.

- At approximately the 2:16 time mark, a female co-conspirator says ". . . don't light it on fire." Another female co-conspirator responds, ". . . you have like five minutes . . . until I can figure out how to get this bitch burned."

- At approximately the 2:28 time mark, Frey steps away from the shelving unit. Defendant ███ then grabs an unknown liquid bottle from a

13

2020R00251

counter and approaches the shelving unit, apparently in tandem with FREY.

- At approximately the 2:36 time mark, a female co-conspirator announces, "He lit the fire!"

- At approximately the 2:39 time mark, Frey and defendant ████ together momentarily step away from the shelving unit and look towards the store's entryway.

- At approximately the 2:45 time mark, a female co-conspirator yells, "Ya'll, we gotta hurry the fuck up!"

- At approximately the 2:46 time mark, Frey and defendant ████ return to the shelving unit.

- Frey and defendant ████ are seen standing and moving around together in front of the shelving unit, with the activity of their hands obscured from the 2:49 time mark to the 2:59 time mark. At least some of the time, Co-Conspirator 1 appears to be standing on her tip-toes, consistent with attempting to maneuver her hands high above her head towards the direction of the shelving unit. (Note: At least some shelving unit fire damage was on the top shelves, according to the inspection by ATF personnel).

23.    Near the end of Video 2, Frey can be seen taking at least five bottles from the counter and placing them in his backpack. These bottles appear to be the same ones that Frey and defendant ████ had in their hands when they were near the shelving units that ATF inspectors subsequently determined sustained fire damage. According to RT (the owner the Great Health and Nutrition store), these bottles located on his counter (the contents of which were dumped upon certain surfaces within RT's store by at least Frey, according to the May 28, 2020 surveillance video) are bottles of "Uncle Bud's Organic Hemp Seed Oil Hand Sanitizer." Based upon pictures of those particular Uncle Bud's bottles (which I have reviewed), they

14

2020R00251

contain a written warning which reads, in part, "Flammable. Keep away from heat or flame."

24.     As noted above, on June 3, 2020, an ATF Special Agent and Certified Fire Investigator inspected the Great Health and Nutrition store and observed charring, discoloration, and soot and smoke deposits that he determined were the result of non-accidental application of an open flame to combustible. The charring, discoloration, and soot and smoke deposits are located specifically in the area of the Great Health and Nutrition store where, according to the surveillance video footage in Video 2, FREY is shown lighting a fire.

### Identification of Defendant ▮ and Defendant Baldus

25.     During the late afternoon on Friday, June 5, 2020, ATF issued a press release and provided local media with certain images of the co-conspirators along with a request for any tips or identifying information from the general public. Shortly thereafter, the request for tips and the images were provided to the general public. In response, during the evening of June 5, 2020—and continuing into Saturday, June 6, 2020, ATF received multiple anonymous tips from members of the public, each of which identified Frey as the male in the green sweatshirt described above. In addition, on Sunday, June 7, 2020, ATF received an anonymous tip from a member of the public, which identified defendant ▮. As noted above, on June 8, 2020, the government sought and obtained a warrant to arrest Frey, as authorized in Case No. 20-mj-358-HB, and the government sought and obtained a warrant to search and

15

2020R00251

seize certain evidence from Frey's residence, as authorized in Case No. 20-mj-359-HB.

27.     On June 8, 2020, ATF personnel went to Frey's residence to execute the search warrant in Case No. 20-mj-359-HB.  After their arrival, agents observed an unoccupied vehicle parked across the street from Frey's residence on the corner of Winnetka Avenue North and 65th Avenue North in Brooklyn Park.  ATF personnel submitted that vehicle's information into a Department of Vehicle Services ("DVS") records search and learned that the vehicle was registered to defendant BALDUS. ATF agents executed the search warrant, but discovered that at least one of Frey's relatives was present at the home but that Frey was not present.  One of Frey's relatives confirmed to ATF agents that the location of the parked vehicle registered to defendant BALDUS is where Frey's friends typically park their cars when visiting with Frey.

28.     I have reviewed a DVS photo of defendant BALDUS and the image closely resembles the female identified as defendant BALDUS in the surveillance Videos 1 and 2 summarized above.  More specifically, the female in the DVS photo is wearing around her neck a dark-colored choker, and she appears to have predominately blond hair on the ends, but with dark-colored hair at the base of her scalp. (Note: the white female identified as defendant BALDUS in the surveillance Videos 1 and 2 summarized above was also wearing a dark-colored neck "choker" and had predominately blond hair on the ends, but with dark-colored hair at the base of her scalp).

16

2020R00251

29.   ATF personnel also identified images from a Facebook account in the name of "Baily Baldus" that contains the following image from the account profile:



This Facebook profile image a face of a white female with large dark-colored arm tattoos consistent with those visible on defendant BALDUS in the surveillance Videos 1 and 2.  Also, the most recent profile image found in the Facebook profile is dated March 10 and includes an image depicting a white female with what appears to be a dark in color choker around the female's neck.

30.   ATF personnel also identified images from a Facebook account in the name of "███████████████████" that contains the following image the account profile:



This Facebook profile image shows a face of a white female, which based upon my review of available driver's license photograph records, is defendant ████, who is the same person who appears in this Facebook profile image above. Also, defendant ████'s Facebook profile image shows a wrist with a large watch with an oversized circular face with a light colored band, which appears to be the watch that defendant ████ wore in the Great Health and Nutrition store, as per the footage in Video 1 and Video 2.

31.    On June 8, 2020, while agents continued to execute the search warrant at Frey's residence, a group of people arrived at the residence. That group included, among others, Frey, defendant BALDUS, and Co-Conspirator CF. Co-Conspirator CF was given her *Miranda* rights, which she waived. Agents learned that Co-Conspirator CF is a minor and is related to Frey. In addition to Co-Conspirator CF's

18

2020R00251

*Miranda* waiver, one of her parents also signed a *Miranda* waiver on Co-Conspirator CF's behalf and authorized Co-Conspirator CF to speak with agents. In non-exhaustive summary, while in the presence of at least one of her parents, Co-Conspirator CF confirmed to interviewing agents that she (Co-Conspirator CF) was with Frey, defendant ███████, and defendant BALDUS on or about May 28, 2020, at the Great Health and Nutrition store. ATF agents showed Co-Conspirator CF some of the still images from the Great Health and Nutrition's Videos 1 and 2. Co-Conspirator CF positively identified herself, Frey, defendant ███████, and defendant BALDUS as some of the individuals who were inside the Great Health and Nutrition store on or about May 28, 2020, as per the footage in Videos 1 and 2.

2020R00251

# CONCLUSION

32.    Based on the above information, I believe there is probable cause that

defendant ███████████████████████ and defendant BAILEY MARIE

BALDUS together with Samuel Elliott Frey and Co-Conspirator CF have conspired

with each other to commit arson on property used in interstate commerce, in violation

of Title 18, United States Code, Section 844(i), all in violation of Title 18, United

States Code, Section 371 (Count 1).

Dated: June 8, 2020                              Respectfully submitted,

                                                 Laura Gulick
                                                 Special Agent
                                                 Bureau of Alcohol Tobacco & Firearms

SUBSCRIBED and SWORN to before me by reliable
electronic means (FaceTime and email) pursuant to
Fed. R. Crim. P. 41(d)(3) on this 8 day of June 2020.

The Honorable Hildy Bowbeer
United States Magistrate Judge